WYNN, Circuit Judge, concurring in part
 
 [1]
 
 and dissenting in part:
 

 "When we saw the fours go up, game's over."-David Chadwick, Forward, University of North Carolina, 1967-71
 
 [2]
 

 Beginning in the late 1960s, when the University of North Carolina Tar Heels seized the lead in the second half of a basketball game, Hall of Fame head coach Dean Smith would raise his arm and put
 up four fingers. Requiring no further instruction, two post players would run to the two corners of the court formed by the baseline and the sidelines, and two wing players would move to the corners formed by the mid-court line and the sidelines. The point guard-most famously, Phil Ford-would then dribble the ball at the top of the key as the clock ticked down, occasionally exchanging the ball with one of the wing or post players if the defense applied too much pressure. In this offense-commonly referred to as the "Four Corners"-the clock was the Tar Heels' best friend. The longer the Tar Heels held the ball on offense, the less time their opponent had to try to score and cut into the Tar Heels' lead. The Four Corners proved so successful that college basketball's powers-that-be effectively outlawed it through the adoption of the shot clock in 1985.
 

 In this case, the government-not unlike Dean Smith's Tar Heels-put up the "fours" when Plaintiff-Appellant Sharyl Attkisson,
 
 [3]
 
 a journalist formerly employed by CBS News, filed suit against unnamed employees and agents of the federal government (the "Doe Defendants"). Attkisson alleged that the Doe Defendants conspired to violate her constitutional and statutory rights by accessing and commandeering her home and work internet-connected devices for surveillance purposes. But Attkisson never got a meaningful opportunity to pursue her claims because the government did everything in its power to run out the clock on Attkisson's action-it filed motions challenging venue and jurisdiction, motions challenging the sufficiency of service, motions for extension of time, motions to dismiss, and motions for protective orders.
 

 And just as the Tar Heels had great success running the Four Corners, the government's strategy worked. Although Attkisson diligently sought to identify the Doe Defendants for nearly four years-including by repeatedly serving discovery on the government and third-parties directed at identifying the Doe Defendants-the district court dismissed her case with prejudice against the Doe Defendants for failing to comply with a court order to identify the names of the Doe Defendants by a date certain. The district court did so even though the government's delaying tactics deprived Attkisson of any meaningful opportunity to engage in the discovery necessary to identify the Doe Defendants.
 

 The majority opinion affirms the district court's dismissal of Attkisson's claims against the Doe Defendants on grounds that the dismissal constituted a permissible exercise of the court's discretion to oversee discovery and sanction a party for failing to comply with a court order. But this Court long has held that plaintiffs-like Attkisson-who state a plausible claim that unnamed defendants violated their constitutional or statutory rights are entitled to a meaningful opportunity to engage in discovery aimed at identifying the "true identity of an unnamed party."
 
 Schiff v. Kennedy
 
 ,
 
 691 F.2d 196
 
 , 197-98 (4th Cir. 1982). And this Court has held that dismissal of an action for failure to comply with a court order is a "drastic" sanction,
 
 Hillig v. C.I.R.
 
 ,
 
 916 F.2d 171
 
 , 174 (4th Cir. 1990), that courts should impose only in "extreme circumstances,"
 
 Reizakis v. Loy
 
 ,
 
 490 F.2d 1132
 
 , 1135 (4th Cir. 1974).
 

 Because the government deprived Attkisson of a meaningful opportunity to identify the Doe Defendants and the district court never determined that the requisite
 "extreme circumstances" were present to warrant dismissal for failure to comply with a court order, I disagree with the majority opinion's determination that the district court permissibly exercised its discretion in dismissing Attkisson's claims against the Doe Defendants. Not only should we disapprove of the tactics the government used to run out the clock on Attkisson's claims, but we should also reject the troubling "game plan" it provided for the government and private parties to prevent disclosure of-and, therefore, responsibility for-their potentially unconstitutional or illegal electronic surveillance activities. Accordingly, I respectfully dissent as to the dismissal of Attkisson's claims against the Doe Defendants.
 

 I.
 

 A.
 

 Because the district court dismissed Attkisson's action prior to meaningful discovery, the relevant allegations, which this Court must accept as true, are set forth in Attkisson's complaint. At the time of the events giving rise to her claim, Attkisson had been working as an investigative reporter for CBS News for 20 years. In early 2011, Attkisson began reporting on the "Fast & Furious" initiative, under which the Bureau of Alcohol, Tobacco, and Firearms ("ATF") purposely allowed firearms dealers to sell marked weapons to straw buyers, in anticipation that the weapons would later be sold to Mexican drug cartels, thereby facilitating the identification and apprehension of key figures in the cartels. CBS aired a report on the Fast & Furious program on February 22, 2011. That report quoted and relied on confidential sources procured by Attkisson. Attkisson continued to report the story, which the Department of Justice initially denied, over the next several months. According to the complaint, Attkisson's sources within ATF told Attkisson "that the [a]gency was actively seeking to identify government insiders who were providing information or 'leaking' to her and CBS." J.A. 123.
 

 In October 2011, the government's Fast & Furious program came under renewed scrutiny when law enforcement officers found weapons distributed through the Fast & Furious program at several crime scenes, including the scene of the murder of an ATF agent. That fall, Attkisson "began to notice anomalies in numerous electronic devices at their home in Virginia." J.A. 124. According to the complaint, Attkisson's home and work computers would turn on and off at random, her house's alarm would "chirp[ ] daily at different times," and her phone and television experienced problems. J.A. 124. All the affected devices were connected to the Internet via Verizon's fiber optic service, FiOS. Verizon failed to cure the problems, despite making multiple attempts over a period of more than a year, including through installation of a new router. J.A. 124.
 

 During 2012, Attkisson continued to experience "anomalies" with her internet-connected devices, which anomalies Attkisson repeatedly reported to Verizon, friends, and business associates. In December 2012, one of Attkisson's "contact[s] with U.S. government intelligence experience" inspected Attkisson's home and found an "extra" fiber optic cable "dangling" from Attkisson's exterior Verizon box. J.A. 129. After Attkisson contacted Verizon regarding the "extra" cable, "a person represented to be a Verizon technician" visited Attkisson's home on January 1, 2013 and removed the cable. J.A. 129. According to the complaint, notwithstanding that Attkisson told the technician to leave the cable, it disappeared. Over the next week, the Attkissons continued to experience problems with their internet
 service, which Verizon repeatedly, but unsuccessfully, tried to resolve.
 

 On January 8, 2013, "an individual with special expertise in computer forensics" conducted a forensic examination of Attkisson's laptop. J.A. 130. The expert reported that the "laptop showed clear evidence of outside and unauthorized 'intrusion,' that the sources of the intrusion were state-supported due to the sophisticated nature of the technology used," and that "the software fingerprint indicated that the software was proprietary to the federal government." J.A. 130. According to the forensic analysis report, "[t]he intrusion included, among other surveillance, keystroke monitoring, exfiltration of data, audio surveillance of [Attkisson's] conversations and activities at home by activating Skype, mining personal passwords, monitoring work and personal email, and probable compromise of [Attkisson's] work and personal smartphones." J.A. 130. "The report also stated the intruders had accessed CBS network systems ... and that the perpetrator had also place three (3) classified documents deep in the computer's operating system." J.A. 130. The forensic analysis determined that the intrusion began as early as June 2011 and traced the intrusion to an Internet Protocol ("IP") "address owned, controlled, and operated by the United States Postal Service," which "has been publicly reported, including in [Inspector General] internal audits, to have a working relationship with the FBI, Department of Homeland Security, and [the Department of Justice] for domestic surveillance projects." J.A. 125, 134.
 

 Several days later, Attkisson notified CBS, which hired an "independent forensic computer analyst" to inspect Attkisson's home and internet-connected devices. J.A. 131. That forensic investigation, conducted on February 2, 2013, found that Attkisson's work and home computers had been subjected to a "coordinated, highly-skilled series of actions and attacks directed at the operation of the computers and the storage of data thereon." J.A. 131. Several days after that second investigation, Attkisson's desktop computer began to malfunction, shut down, emitted a "burning odor," and was rendered permanently inoperable. J.A. 131. The complaint further alleges that Attkisson's BlackBerry, which was connected to the Verizon network, also was compromised.
 

 On June 11, 2013, CBS issued a public statement, reporting that Attkisson's computer had been accessed using "sophisticated methods" by an unauthorized party on multiple occasions. J.A. 132. The independent security firm hired by CBS to analyze Attkisson's computer publicly confirmed that report. The government issued a statement, stating that to its "knowledge, the Justice Department has never compromised Ms. Attkisson's computers, or otherwise sought any information from or concerning any telephone, computer or other media device she may own or use." J.A. 131.
 

 B.
 

 On December 30, 2014, Attkisson brought a
 
 Bivens
 
 action under the First and Fourth Amendments against named and unnamed federal defendants in the Superior Court for the District of Columbia. The government removed the case to the U.S. District Court of the District of Columbia. Within two months of first filing suit, Attkisson sought leave of the court "to serve limited, immediate discovery ... to determine the true [identities] of the Doe Defendants." J.A. 8. Attkisson argued that "good cause" existed to afford such discovery because she could not further prosecute her action until she identified the Doe Defendants.
 

 The government opposed Attkisson's discovery request for two reasons: (1) none of the defendants-named or unnamed-had been served and therefore the parties could not, according to the government, conduct a Rule 26 discovery conference and (2) because the case "implicate[d] qualified immunity issues, ... the Court should resolve those issues and similar preliminary issues
 
 before any discovery occurs
 
 ." Defs.' Opp. To Pls.' Mot. to Expedited Disc.,
 
 Attkisson v. Holder
 
 , No. 15-238 (March 3, 2015), ECF No. 11 (emphasis added). The government's position, therefore, was tantamount to asserting that early discovery should never be available in a
 
 Bivens
 
 case against unnamed defendants. The government opposed Attkisson's requested discovery pertaining to the identity of the Doe Defendants, even as it simultaneously denied-and continues to deny-that it represents the Doe Defendants. The district court denied without prejudice Attkisson's request for expedited discovery on grounds that Attkisson had not yet completed service of the named defendants and that the discovery request was "overbroad" because Attkisson had not provided an "explanation of precisely what discovery [she] seeks to take." J.A. 8.
 

 On March 20, 2015, having completed service of the named defendants, Attkisson again moved for expedited discovery. To respond to the district court's concern regarding the scope of the discovery she sought, Attkisson attached twenty-one interrogatories and three requests for production. The interrogatories sought "[t]he identity of any person" who had knowledge as to the various specific types of electronic incursions allegedly perpetrated between 2011 and 2013 "on computers owned or operated by Ms. Attkisson"-including "remotely altering computer VPN settings," "
 
 smbclient
 
 ," "
 
 kcpassword
 
 ," "
 
 kickstart
 
 ," and "use of Intel AMT software." Pls.' Renewed Mot. for Expedited Disc. 3-5,
 
 Attkisson v. Holder
 
 , No. 15-238 (March 20, 2015), ECF No. 21-1. The interrogatories also sought the "identity and contact information of all persons" who had "access to," "us[ed]," and were "responsible for maintaining, monitoring, securing, and otherwise controlling" the Postal Service-owned IP address the forensic analysis connected to the incursions.
 
 Id.
 
 at 5-6.
 

 Less than a month later, the government moved to dismiss and again opposed Attkisson's request for expedited discovery, asserting that her discovery requests were both too numerous and not "narrowly tailored" to identifying the Doe Defendants. Attkisson filed an amended complaint on April 30, 2015. On July 6, 2015, the district court denied Attkisson's second request for expedited discovery. The next day, the government again moved to dismiss. Concurrently, Attkisson served notices of depositions and subpoenas on several third parties, including the United States Postal Service, seeking testimony and documents pertaining to the IP address identified in the forensic analysis so as to identify the Doe Defendants.
 

 In October 2015-after Attkisson repeatedly and unsuccessfully sought the government's voluntary compliance with her discovery requests-Attkisson moved the district court to compel compliance with those requests. The government successfully sought several extensions of time, eventually filing on December 7, 2015, a brief in opposition to the motion to compel and a motion for protective order. Conceding that Attkisson's discovery sought "to uncover the identities of the 'Unknown Federal Agents' or 'Doe defendants' "-
 
 i.e.
 
 , that the discovery requests were tailored to the appropriate issue-the government argued that Attkisson could not obtain such discovery because, in part, "there [wa]s no evidence that Plaintiffs have conferred with the remaining 'Doe'
 

 defendants in this case for purposes of discovery," which, according to the government, Federal Rule of Civil Procedure 26 required. Third-Party U.S. Postal Serv.'s Opp. To Pls.' Mot. to Compel
 
 And
 
 Mot. to Quash Subpoena and/or for Protective Order 13,
 
 Attkisson v. Holder
 
 , No. 15-238 (Dec. 7, 2015), ECF No. 47. Put differently, the government took the position that Attkisson could not obtain discovery
 
 to identify the Doe Defendants
 
 because she had not engaged in a Rule 26 conference
 
 with the unidentified Doe Defendants
 
 .
 

 The parties engaged in additional briefing regarding Attkisson's motion to compel during the first half of 2016, with the government successfully obtaining several deadline extensions. On July 28, 2016-and still without Attkisson having had an opportunity to conduct any discovery-the district court consolidated Attkisson's
 
 Bivens
 
 action with a separate action under the Federal Tort Claims Act that Attkisson had brought against several parties, including the United States, related to the same alleged conduct. When it consolidated the two actions, the district court dismissed Attkisson's pending discovery motions in the
 
 Bivens
 
 action as moot. Attkisson moved the district court to reconsider its dismissal of her motion to compel, which the government again opposed. Around the same time, the government filed a third motion to dismiss. On March 19, 2017, the District of Columbia district court denied, without prejudice, the government's motion to dismiss and transferred the case to the U.S. District for the Eastern District of Virginia, again denying Attkisson's motion to compel as moot.
 

 On July 26, 2017-after waiting nearly four months for the court to assign a judge to her case and only eight days after that assignment
 
 [4]
 
 -Attkisson again sought to compel compliance with her previously served discovery requests. In early August 2017-and after obtaining several more deadline extensions-the government filed a brief in opposition to Attkisson's renewed motion to compel and a fourth motion to dismiss, this time for failure to state a claim and for lack of jurisdiction. On September 1, 2017, a magistrate judge denied Attkisson's motion to compel without prejudice.
 

 The district court directed Attkisson to file a consolidated complaint, which she filed on September 18, 2017. That eight-count complaint, which names the Doe Defendants as defendants, asserted
 
 Bivens
 
 claims under the First and Fourth Amendments and violations of the Electronic Communications Privacy Act ("ECPA"), the Stored Communications Act, the Computer Fraud and Abuse Act, the Foreign Intelligence Surveillance Act, and the Virginia Computer Crimes Act, as well common law trespass to chattel and land claims. On September 22, 2017, the parties filed a joint discovery plan. Notwithstanding that the discovery plan purported to establish a January 12, 2018, deadline for completion of discovery, the government made clear in a footnote its position that "discovery-including discovery not specifically directed at the individually sued government officials-
 
 may not proceed in this action
 
 " until the district court ruled on the government's motion to dismiss. Joint Proposed Disc. Plan,
 
 Attkisson v. Holder
 
 , No. 1:17-cv-00364 (Sept. 22, 2017), ECF No. 123 (emphasis added).
 

 Within two weeks of the filing of the consolidated complaint, the district court issued an opinion and order dismissing
 most, but not all, of Attkisson's claims.
 
 Attkisson v. Holder
 
 , No. 1:17-CV-364,
 
 2017 WL 5013230
 
 (E.D. Va. Nov. 1, 2017). Of particular relevance to this dissent, the district court did not dismiss Attkisson's
 
 Bivens
 
 and ECPA claims against the Doe Defendants.
 
 Id.
 
 at *1.
 

 Following the district court's motion-to-dismiss order, Attkisson sought testimonial and documentary discovery from numerous federal agencies as well as Verizon's Virginia subsidiary. For example, Attkisson noticed a deposition of the Postal Service pursuant to Rule 30(b)(6), requesting that the Postal Service make available for deposition "one or more persons" to testify as to the "ownership and control" of two specific IP version 4 ("IPv4") addresses that Attkisson's forensic analyses identified were used in the alleged intrusions. In particular, Attkisson sought testimony regarding "[w]ho was responsible for managing, tracking, and monitoring these IPv4 addresses within the Postal Service"; "[w]hat persons or organizations were permitted access to or use of the IPv4 address in the designated time frame"; "[a]ny and all records, logs, or other form of identification material that will or may assist in identifying what person or persons provided for each such use of these IPv4 addresses during the referenced time frame"; and "[a]ny and all records, logs, or other form of identification material that will or may assist in identifying the operational use of these IPv4 addresses." J.A. 209-10.
 

 The government consented to a limited deposition of a United States Postal Service employee regarding the IPv4 addresses identified in the forensic analysis, which deposition revealed that Verizon contracted with the Postal Service to provide network services and identified twelve other IP addresses connected to the alleged incursion. But otherwise the government and Verizon successfully moved for a protective order on overbreadth grounds. Thereafter-and in accordance with the position it took in the Joint Discovery Plan-the government sought a stay of all discovery pending resolution of its anticipated (renewed) motion to dismiss.
 

 On December 1, 2017, a magistrate judge entered a revised scheduling order directing Attkisson "to substitute named parties for the Doe Defendants no later than January 5, 2018 at 10:00 a.m." J.A. 259. In an order entered December 29, 2017, the district court extended that deadline until February 5, 2018, emphasizing that "[t]his extension is the final extension that plaintiffs will receive because the interests of judicial economy and fairness to third parties and potential future defendants dictate that plaintiffs move forward with this litigation in as timely a fashion as possible." J.A. 274-75.
 

 Thereafter, Attkisson reserved discovery against the federal agencies and Verizon, and moved to compel. Verizon again moved for a protective order. J.A. 276. The magistrate granted in part the motion for protective order, allowing Attkisson to conduct a 30(b)(6) deposition of Verizon employee as to the twelve Verizon-linked IP addresses identified in the Postal Service deposition. The magistrate rendered that determination because he concluded that, at that stage of the litigation, discovery should be "limited to trying to identify the Doe [D]efendants," with liability discovery "com[ing] later." J.A. 512. The government also continued to resist Attkisson's discovery requests on overbreadth grounds, maintaining that it was obliged to permit discovery only of "readily available" information pertaining to the identities of the Doe Defendants. J.A. 521. At a January 12, 2018 hearing-less than a month before the district court's deadline for Attkisson to identify the Doe Defendants-the magistrate denied without prejudice Attkisson's
 motion to compel on grounds that it appeared that the parties were moving towards an agreed-on discovery plan related to identifying the Doe Defendants. J.A. 524.
 

 On February 5, 2018, Attkisson filed a proposed amended complaint that continued to list John Doe federal employee and agent defendants, but also added new causes of action and several Verizon-affiliated entities, the United States of America, and the Federal Bureau of Investigation as defendants. In an order entered May 15, 2018, the district court denied Attkisson leave to amend and dismissed Attkisson's pending action against the Doe Defendants with prejudice. The Court held that dismissal was warranted because Attkisson's proposed complaint failed to offer substitutes for the Doe Defendants, as its December 29, 2017 order required, and, also in contravention of that order, added new defendants without seeking the court's leave. As to the Doe Defendants, in particular, the court stated:
 

 Since 2014 when the plaintiffs' first complaint was filed, none of the John Doe defendants has been identified or served and plaintiffs have made no substantial progress in identifying them. As such, the time has come to end this litigation against them as well and for this reason, the claims against them are also dismissed by this Order.
 

 J.A. 669. Attkisson timely appealed.
 

 II.
 

 Attkisson argues that the district court erred in dismissing her claims against the Doe Defendants. Although its order is not a model of clarity, the district court appears to have dismissed those claims for two related reasons: (A) Attkisson failed to make "substantial progress" in identifying the Doe Defendants and (B) Attkisson failed to comply with the court's order to substitute named parties for the Doe Defendants by February 5, 2018. I do not believe that either purported failure justified the district court's decision to dismiss Attkisson's claims against the Doe Defendants.
 

 A.
 

 "Ordinarily a tort victim"-like Attkisson-"who does not know who the tortfeasor is cannot sue."
 
 Billman v. Ind. Dep't of Corrs.
 
 ,
 
 56 F.3d 785
 
 , 789 (7th Cir. 1995). But this Court and other courts long have recognized that if a tort complaint plausibly alleges that an unnamed defendant is an "actual" person or entity, then an action may "proceed against real, but unidentified, defendants."
 
 Schiff
 
 ,
 
 691 F.2d at
 
 197 (citing
 
 Bivens v. Six Unknown Agents of Fed. Bureau of Narcotics
 
 ,
 
 403 U.S. 388
 
 ,
 
 91 S.Ct. 1999
 
 ,
 
 29 L.Ed.2d 619
 
 (1971) ). In such cases, a district court should dismiss the action on grounds that the plaintiff failed to allege the defendant's true identity
 
 only
 
 "if it does not appear that the true identity of an unnamed party can be discovered through discovery or through intervention by the court."
 

 Id.
 

 at 198 ;
 
 see also
 

 Davis v. Kelly
 
 ,
 
 160 F.3d 917
 
 , 921 (2d Cir. 1998) (collecting cases);
 
 Billman
 
 ,
 
 56 F.3d at 789
 
 (holding that a plaintiff's "initial inability to identify the injurers is not by itself a proper ground for the dismissal of the suit");
 
 Munz v. Parr
 
 ,
 
 758 F.2d 1254
 
 , 1257 (8th Cir. 1985) ("Dismissal is proper
 
 only
 
 when it appears that the true identity of the defendant cannot be learned through discovery or the court's intervention." (emphasis added)).
 

 Courts allow plaintiffs to sue unnamed tortfeasors-and, in appropriate circumstances, engage in early discovery to identify the true identity of those alleged tortfeasors-when, as here, a plaintiff lacks the capacity to identify the names of the tortfeasors absent the power of the courtsFor
 example, courts allow an injured party to sue an unnamed tortfeasor when circumstances outside the injured party's control posed obstacles to the injured party identifying the tortfeasor prior to filing suit.
 
 See, e.g.
 
 ,
 
 Billman
 
 ,
 
 56 F.3d at 789
 
 (holding that a prison inmate was entitled to discovery when his conditions of confinement rendered it difficult, if not impossible, for him to identify the alleged tortfeasor prior to suit). Likewise, courts allow an injured party to sue an unnamed tortfeasor when the allegedly tortious conduct, by its nature, conceals the identity of the tortfeasor.
 
 See, e.g.
 
 ,
 

 id.
 

 (noting that when "the plaintiff has been injured as the consequence of the actions of an unknown member of a collective body, identification of the responsible party may be impossible without pretrial discovery");
 
 Columbia Ins. Co. v. seescandy.com
 
 ,
 
 185 F.R.D. 573
 
 , 578 (N.D. Cal. 1999) (noting that when a plaintiff is injured by a tortious act allegedly committed via the internet by a "pseudonymous[ ] or anonymous[ ]" party, the plaintiff is "likely to find [her]self chasing the tortfeasor from Internet Service Provider (ISP) to ISP, with little hope of actually discovering the identity of the tortfeasor" absent compulsory judicial discovery).
 

 Considering this precedent, the district court abused its discretion in dismissing Attkisson's action against the Doe Defendants without providing Attkisson with a meaningful opportunity to engage in discovery to determine their true identity. To begin, Attkisson's operative complaint-which we must accept as true-includes sufficient non-conclusory allegations against the Doe Defendants to state a Fourth Amendment
 
 Bivens
 
 claim and a claim under the ECPA. The complaint recites at length, and with factual specificity, the technical "anomalies" Attkisson experienced with her internet connected devices. The complaint also discusses with factual specificity the various forensic analyses of Attkisson's devices conducted by security consultants-including a security consultant hired by CBS-revealing that those devices had been compromised and commandeered. The forensic analyses further revealed that those incursions included searching records stored on Attkisson's devices, monitoring Attkisson's electronic communications, and using Attkisson's internet connected devices to listen to her conversations at home. According to the complaint, those forensic analyses concluded that the intrusions were "sophisticated"-and therefore "state-sponsored"-and derived from IPv4 addresses owned, controlled, and operated by the government, and the Postal Service, in particular.
 

 Based on those allegations, it is "plausible" that the government-and/or a private entity operating on the government's behalf-searched and commandeered Attkisson's devices and infringed on her right to privacy, in violation of the Fourth Amendment.
 
 See
 

 Buonocore v. Harris
 
 ,
 
 65 F.3d 347
 
 , 356 (4th Cir. 1995) ("[T]he special protection to be afforded a person's right to privacy within his own home has also been continuously and consistently recognized by the Court. The right to 'sanctity of private dwellings,' has been held to be the right 'ordinarily afforded the most stringent Fourth Amendment protection.' "). Likewise, the complaint adequately alleges that these same government actors "intercepted" Attkisson's electronic communications in violation of the ECPA.
 
 18 U.S.C. § 2520
 
 .
 

 Second, the allegations in the complaint render it plausible that "actual" persons-
 
 i.e.
 
 , the Doe Defendants-violated Attkisson's constitutional and statutory rights.
 
 Schiff
 
 ,
 
 691 F.2d at 197
 
 . Put simply, the "sophisticated" nature of the intrusions; the broad variety of alleged surveillance, including "keystroke monitoring, exfiltration of data, audio surveillance of [Attkisson's
 ] conversations and activities at home by activating Skype, mining personal passwords, monitoring work and personal email, and probable compromise of [Attkisson's] work and personal smartphones," J.A. 130; the years-long duration of the anomalies and incursions, despite repeated efforts to resolve them; and the efforts to hide evidence of the incursions provide factual support for the allegations that "actual" persons perpetrated the alleged constitutional and statutory violations.
 

 Additionally, in criminal proceedings, the government routinely argues-and courts often agree-that when a specific IP address is used to perpetrate alleged wrongdoing online there is a "fair probability"-
 
 i.e.
 
 , probable cause-that the individual or entity that owns or controls the IP address engaged in, or possesses evidence of, the wrongdoing.
 
 See, e.g.
 
 ,
 
 United States v. Vosburgh
 
 ,
 
 602 F.3d 512
 
 , 526 & n.13 (3d Cir. 2010) (noting that "several Courts of Appeals have held that evidence that the user of a computer employing a particular IP address possessed or transmitted child pornography can support a search warrant for the physical premises linked to that IP address");
 
 United States v. Perrine
 
 ,
 
 518 F.3d 1196
 
 , 1201-04 (10th Cir. 2008). Attkisson's complaint identified two specific IPv4 addresses owned and controlled by the government that were used to perpetrate the alleged unlawful surveillance. Accordingly, the complaint established that it is plausible that the individuals employed by, or acting on behalf of, the government who used and maintained those IPv4 addresses perpetrated the allegedly unlawful surveillance or have information that will facilitate identification of the individuals responsible for perpetrating the wrongdoing.
 

 Third, there was no basis for the district court to determine that "the true identity of [the Doe Defendants could not] be discovered through discovery or through intervention by the court."
 
 Schiff
 
 ,
 
 691 F.2d at 198
 
 . Indeed, the government itself routinely uses IP addresses to identify unknown wrongdoers. For example, the government uses IP addresses as the starting point to identify unknown individuals who possess or share child pornography.
 
 See, e.g.
 
 ,
 
 Vosburgh
 
 ,
 
 602 F.3d at
 
 526 & n.13 (collecting cases);
 
 United States v. Bynum
 
 ,
 
 604 F.3d 161
 
 , 162-63 (4th Cir. 2010). Likewise, private parties such as copyright holders frequently use IP addresses to identify unknown defendants who allegedly engage in online copyright infringement.
 
 See, e.g.
 
 ,
 
 Purzel Video GmbH v. St. Pierre
 
 ,
 
 10 F. Supp. 3d 1158
 
 , 1164 (D. Colo. 2014) ;
 
 Malibu Media, LLC v. Roldan
 
 , No. 8:13-cv-3007,
 
 2014 WL 3805494
 
 , at *1 (M.D. Fla. Aug. 1, 2014) ;
 
 Loud Records LLC v. Minervini
 
 ,
 
 621 F.Supp.2d 672
 
 , 676 (W.D. Wisc. 2009). Given that the government as well as private parties successfully use IP addresses to identify wrongdoers in other contexts, there is no reason to believe that pre-trial discovery would not allow Attkisson to use the IPv4 addresses to identify the true identity of the Doe Defendants.
 

 To be sure, the government is a "collective body," rather than a single user, which may somewhat complicate the process for identifying which, if any, government employees perpetrated the allegedly unlawful surveillance of Attkisson's devices.
 
 Billman
 
 ,
 
 56 F.3d at 789
 
 . But the difficulty a plaintiff faces in identifying pre-filing a particular wrongdoer that works for a multi-member organization, like the government, is one of the reasons courts allow a plaintiff to sue unnamed wrongdoers and to use pre-trial discovery to identify the wrongdoers' identities.
 

 Id.
 

 ;
 
 see also
 

 Palmer v. Bd. of Educ. of Cmty. Unit Sch. Dist. 201-U, Will Cnty., Ill.
 
 ,
 
 46 F.3d 682
 
 , 688 (7th Cir. 1995) (holding that the district court erred in dismissing plausible claim against unnamed governmental employees
 because "[w]hen a collective body ... takes a complex series of actions over a span of years, it may be difficult to pin down individual responsibility without discovery"). That is particularly true when, as here, members of a collective body allegedly perpetrate a wrong using the Internet, which allows wrongdoers to "act pseudonymously and anonymously," and thereby evade legal liability absent an injured party's use of discovery to determine the wrongdoers' identity.
 
 Columbia Ins.
 
 ,
 
 185 F.R.D. at 578
 
 .
 

 Finally, the district court failed to afford Attkisson a meaningful opportunity to engage in discovery to determine the true identity of the Doe Defendants. Notwithstanding that Attkisson repeatedly served discovery on the government and repeatedly moved the district court to compel the government to comply with the discovery requests, the sum of the discovery Attkisson obtained from the government during the four years her case was pending was a limited deposition of a single Postal Service employee. The government never turned over any documents in response to Attkisson's subpoenas, nor did it answer any interrogatories. In such circumstances, Attkisson should not be faulted for failing to identify the Doe Defendants.
 

 The district court refused to compel the government to comply with Attkisson's discovery requests because it believed that some of the requests were unrelated to the identification of the Doe Defendants. But most of Attkisson's requests sought information directly related to the identities of the Doe Defendants, including "[w]ho was responsible for managing, tracking, and monitoring these IPv4 addresses within the Postal Service"; "[w]hat persons or organizations were permitted access to or use of the IPv4 address in the designated time frame"; "[a]ny and all records, logs, or other form of identification material that will or may assist in identifying what person or persons provided for each such use of these IPv4 addresses during the referenced time frame"; and "[a]ny and all records, logs, or other form of identification material that will or may assist in identifying the operational use of these IPv4 addresses." J.A. 209-10. And Attkisson's request for "[t]he identity of any person" who had knowledge regarding the various specific types of electronic incursions allegedly perpetrated against Attkisson's devices-including "remotely altering computer VPN settings," "
 
 smbclient
 
 ," "
 
 kcpassword
 
 ," "
 
 kickstart
 
 ," and "use of Intel AMT software"-also specifically related to the identity of the Doe Defendants. Pls.' Renewed Mot. for Expedited Disc.,
 
 Attkisson v. Holder
 
 , No. 15-238 (March 20, 2015), ECF No. 21-1. To the extent the district court believed any of Attkisson's other requests swept too broadly, it could have granted Attkisson's motion to compel only as to those requests bearing on the identity of the Doe Defendants.
 

 The district court also denied Attkisson's final motion to compel because it believed that the parties were working towards a consensual discovery plan. I do not question the district court's judgment that a consensual discovery plan is preferable to court-ordered discovery. But at the time it denied Attkisson's final motion to compel,
 
 the court's deadline for Attkisson to substitute names for the Doe Defendants was less than a month away
 
 . Given the government's longstanding opposition to affording Attkisson
 
 any
 
 discovery-including its initial Kafkaesque position that Attkisson was not entitled to obtain discovery regarding the identity of the Doe Defendants
 
 until Attkisson conducted a Rule 26(d) discovery conference with the unidentified Doe Defendants
 
 and the government's later, equally unsupported position, which the magistrate judge rightly rejected,
 that Attkisson was entitled to discover only whatever information the government deemed "readily available"-and the court's fast approaching substitution deadline, it was incumbent on the district court to ensure that the government did not use its ongoing discovery negotiations with Attkisson to run out the clock on her claims. Put simply, the district court needed to either (1) toll its deadline until Attkisson and the government reached an agreement as to a discovery plan that would allow Attkisson to meaningfully pursue the identity of the Doe Defendants or (2) compel the government to comply with Attkisson's reasonable discovery requests in advance of the deadline. It did neither; instead, it enforced its deadline even though Attkisson never obtained meaningful discovery, effectively rewarding the government for its intransigence.
 

 In sum, the district court reversibly erred when it dismissed Attkisson's action against the Doe Defendants for failing to identify their names. That conclusion accords with the approach taken by our sister circuits, which have held that a district court abused its discretion when-as here-it dismissed a plausible claim against an unnamed defendant without allowing the plaintiff a meaningful opportunity to engage in discovery to determine the defendant's identity.
 
 See, e.g.
 
 ,
 
 Vohra v. Cnty. of Orange
 
 , 288 Fed. App'x 395, 396 (9th Cir. 2008) ;
 
 Green v. Doe
 
 , 260 Fed. App'x 717, 719 (5th Cir. 2007) ;
 
 Valentin v. Dinkins
 
 ,
 
 121 F.3d 72
 
 , 75-76 (2d Cir. 1997) ;
 
 Billman
 
 ,
 
 56 F.3d at 787-89
 
 .
 

 And there is more. The district court compounded its error in dismissing Attkisson's action against the Doe Defendants by failing to grant, at least in part, Attkisson's repeated motions to compel. In the context of allegedly tortious acts committed over the Internet, in particular-like the Doe Defendants' alleged unlawful surveillance of Attkisson-courts have adopted several multi-factorial tests to guide a district court's analysis in determining whether to allow the plaintiff early or expedited discovery to facilitate identification of an unnamed defendant.
 

 For example, the Second Circuit has directed district courts to weigh "(1) the concreteness of the plaintiff's showing of a prima facie claim of actionable harm, (2) the specificity of the discovery request, (3) the absence of alternative means to obtain the subpoenaed information, (4) the need for the subpoenaed information to advance the claim, and (5) the objecting party's expectation of privacy."
 
 See
 

 Arista Records, LLC v. Doe 3
 
 ,
 
 604 F.3d 110
 
 , 119 (2d Cir. 2010) (internal alterations omitted) (citing
 
 Sony Music Entm't Inc. v. Does 1-40
 
 ,
 
 326 F.Supp.2d 556
 
 , 564-65 (S.D.N.Y. 2004) ). Other courts apply similar tests.
 
 See, e.g.
 
 ,
 
 Columbia Ins.
 
 ,
 
 185 F.R.D. at 578-80
 
 (holding that a plaintiff is entitled to early discovery targeted at identifying an unnamed defendant if the plaintiff (1) "identif[ies] the missing party with sufficient specificity such that the Court can determine that defendant is a real person or entity who could be sued in federal court"; (2) "identif[ies] all previous steps taken to locate the elusive defendant"; (3) "establish[es] to the Court's satisfaction that plaintiff's suit against defendant could withstand a motion to dismiss"; and (4) "file[s] a request for discovery with the Court, along with a statement of reasons justifying the specific discovery requested as well as identification of a limited number of persons on whom discovery process might be served and for which there is a reasonable likelihood that the discovery process will lead to identifying information about the defendant that would make service of process possible.").
 

 Here, the considerations other courts have deemed relevant supported awarding
 Attkisson early discovery targeted at identifying the Doe Defendants. As explained above, Attkisson plausibly alleged that unnamed defendants violated her constitutional and statutory rights and that those defendants were "actual" individuals capable of identification through discovery. The complaint also set forth several steps Attkisson had taken to identify the perpetrators of the alleged violations, including obtaining multiple forensic analyses of her devices, filing a complaint with the Department of Justice Inspector General, allowing the government to inspect her laptop computer, and submitting Freedom of Information Act requests. And even if a few requests were somewhat overbroad, Attkisson served numerous discovery requests directly bearing on the identity of the Doe Defendants. Finally, because information potentially relevant to the identity of the Doe Defendants lies exclusively in the hands of the government-and because her other efforts to identify the Doe Defendants had proven unsuccessful-Attkisson established that she lacked alternative means to identify the Doe Defendants.
 

 B.
 

 The district court also dismissed Attkisson's action against the Doe Defendants for failure to comply with the court's December 29, 2017, order that Attkisson substitute names for the Doe Defendants on or before February 5, 2018. Federal Rule of Civil Procedure 41(b) permits a district court to involuntarily dismiss an action if a plaintiff fails to comply with a court order. We review for abuse of discretion a district court's dismissal of an action for failure to comply with a court order.
 
 See
 

 Ballard v. Carlson
 
 ,
 
 882 F.2d 93
 
 , 96 (4th Cir. 1989).
 

 This Court, like our sister circuits, has recognized that dismissal under Rule 41(b) is a "drastic" penalty,
 
 Hillig
 
 ,
 
 916 F.2d at 174
 
 , that should be limited to "extreme circumstances,"
 
 Reizakis
 
 ,
 
 490 F.2d at
 
 1135 ;
 
 see also, e.g.
 
 ,
 
 Dahl v. City of Huntington Beach
 
 ,
 
 84 F.3d 363
 
 , 366 (9th Cir. 1996) (holding that dismissal under Rule 41(b)"is so harsh a penalty it should be imposed as a sanction only in extreme circumstances");
 
 Jackson v. City of New York
 
 ,
 
 22 F.3d 71
 
 , 75 (2d Cir. 1994) ("Although dismissal pursuant to Rule 41(b) is a matter committed to the discretion of a district court ... dismissal is a harsh remedy to be utilized only in extreme situations." (internal quotation marks omitted));
 
 Flaksa v. Little River Marine Const. Co.
 
 ,
 
 389 F.2d 885
 
 , 888 (5th Cir. 1968) (dismissal under Rule 41(b) warranted only in "extreme circumstances").
 

 In deciding whether to dismiss a case under Rule 41(b), "[a]gainst the power to prevent delays must be weighed the sound public policy of deciding cases on the merits."
 
 Hillig
 
 ,
 
 916 F.2d at 173-74
 
 . In making that determination, "[t]his Circuit
 
 requires
 
 that the trial court consider four factors before dismissing a case for failure to prosecute: (1) the plaintiff's degree of personal responsibility; (2) the amount of prejudice caused the defendant; (3) the presence of a drawn out history of deliberately proceeding in a dilatory fashion; and (4) the effectiveness of sanctions less drastic than dismissal."
 

 Id.
 

 at 174
 
 (emphasis added).
 
 [5]
 

 Considering this precedent, the district court abused its discretion in dismissing Attkisson's claims against the Doe Defendants based on Attkisson's failure to comply with the court's order. The district court never expressly considered this Court's mandatory four-factor test for dismissing an action for failure to comply with a court order. That legal error, by itself, amounts to an abuse of discretion.
 
 See
 

 Verisign, Inc. v. XYZ.COM LLC
 
 ,
 
 891 F.3d 481
 
 , 484-86 (4th Cir. 2018) (holding that district court abuses its discretion when it applies the wrong legal test);
 
 United States v. Cargill
 
 ,
 
 134 F.3d 364
 
 (4th Cir. 1998) (table) (same);
 
 see also
 

 Koon v. United States
 
 ,
 
 518 U.S. 81
 
 , 100,
 
 116 S.Ct. 2035
 
 ,
 
 135 L.Ed.2d 392
 
 (1996) ("A district court by definition abuses its discretion when it makes an error of law.").
 

 And although the district court adverted, in a conclusory fashion, to some aspects of those four considerations-referencing "prejudic[e]" to defendants and "judicial economy," J.A. 668-it never considered, much less ruled out, "less drastic" sanctions, as this Court requires. Notably, this Court and other courts have held that a district court abused its discretion in dismissing an action under Rule 41(b) when it failed to consider lesser sanctions.
 
 See
 

 Reizakis
 
 ,
 
 490 F.2d at
 
 1135 ;
 
 In re Se. Banking Corp.
 
 ,
 
 204 F.3d 1322
 
 , 1335 (11th Cir. 2000).
 

 Additionally, had the district court considered the mandatory factors set forth in
 
 Hillig
 
 , it should have rendered a different judgment. First, there is no evidence that Attkisson had any degree of personal responsibility in her attorney's purported failure to comply with the court's order. Second, although the passage of time may somewhat prejudice the Doe Defendants, Attkisson correctly notes that any such prejudice is attributable to the government's repeated efforts to delay and resist any discovery. Appellant's Br. at 48. Third, the record belies any finding that Attkisson engaged in "a drawn-out history of deliberately proceeding in a dilatory fashion."
 
 Hillig
 
 ,
 
 916 F.2d at 174
 
 . On the contrary, since the filing of the original complaint, Attkisson has repeatedly sought to engage in discovery to identify the Doe Defendants and faced largely successful resistance from the government and third-parties at every turn. Finally, any number of less drastic remedies, such as denying further leave to amend the complaint to add new defendants or causes of action, were available.
 
 [6]
 

 Additionally, the district court's Rule 41(b) dismissal runs contrary to this Court's stated preference to resolve cases on the merits. Put simply, this case did not present the "extreme circumstances" warranting dismissal under Rule 41(b). Accordingly, I disagree with the majority opinion's conclusion that the district court
 did not reversibly err in dismissing Attkisson's claim against the Doe Defendants.
 
 [7]
 

 III.
 

 The most troubling aspect of the district court's decision to dismiss Attkisson's claims against the Doe Defendants is that it rewards the government's concerted effort to deprive Attkisson any opportunity to pursue her claims and, by doing so, creates a game plan for the government and private parties to follow in future cases in which plaintiffs seek to challenge governmental or private electronic surveillance activities.
 

 At the outset of cases challenging alleged electronic surveillance, the defendants nearly always have exclusive control over virtually all information necessary to identify the individuals responsible for engaging in allegedly unconstitutional or unlawful electronic surveillance. In cases involving governmental surveillance programs, for example, the individuals and entities responsible for the challenged surveillance programs generally will be protected by statutes and regulations preventing the disclosure of classified documents and programs as well as judicial orders sealing records related to warrants issued in criminal and national security investigations. The nature of the Internet, which allows wrongdoers to conceal their identity in a variety of ways, poses further obstacles to identifying individuals responsible for electronic surveillance without the benefit of pre-trial discovery.
 

 This profound information asymmetry sets electronic surveillance cases apart from earlier cases involving tort claims against unnamed defendants. Whereas the plaintiff in
 
 Bivens
 
 , for example, could point to a specific number of officers employed by a specific agency who were in a specific place at a specific time, a plaintiff challenging electronic surveillance faces fatally greater obstacles to narrowing the universe of wrongdoers absent court-supervised discovery.
 

 If a district court creates a deadline for identifying unnamed defendants accused of unlawful electronic surveillance and that deadline is not tethered to whether the defendant affords the plaintiff a meaningful opportunity to discover the identity of the wrongdoers-as was the case here-the defendant has a strong incentive to resist all discovery of information bearing on the identity of wrongdoer. Put simply, when the defendant is not compelled to provide discovery, the plaintiff will be unable to meet the court's deadline to substitute names for the unnamed defendants and the case will be dismissed, just as occurred here.
 

 But "the children's game of pin the tail on the donkey is [not] a proper model for constitutional tort law," nor is the
 
 time-limited
 
 game of pin-the-tail-on-the-donkey that the district court imposed here.
 
 Billman
 
 ,
 
 56 F.3d at 789
 
 . That is particularly true in cases involving electronic surveillance in which the complexity of modern telecommunications systems-coupled with the numerous avenues such systems afford users to conceal their identities-may require more extensive discovery to identify an unnamed defendant. In such instances, artificial time constraints on identifying an
 unnamed defendant are all the more inappropriate.
 

 In recent years, newspapers have been rife with reports of actual or alleged undisclosed electronic surveillance by the government and private entities.
 
 See, e.g.
 
 , Carole Cadwalladr & Emma Graham-Harrison,
 
 Facebook Accused of Conducting Mass Surveillance Through Its Apps
 
 , Guardian (May 24, 2018), https://www.theguardian.com/technology/2018/may/24/facebook-accused-of-conducting-mass-surveillance-through-its-apps; Charlie Savage,
 
 N.S.A. Halts Collection of Americans' Emails About Foreign Targets
 
 , N.Y. Times, Apr. 29, 2017, at A1. Such surveillance has the potential to reveal to the government and private entities broad swaths of highly sensitive personal and commercial information. This case is illustrative-according to the complaint, the incursion not only entailed the searching of Attkisson's computers and the monitoring of her electronic communications, but also involved using her devices to eavesdrop on her oral conversations and interactions with her family in her home. As the government's and private entities' capacity to hoover up data increases-and as we move beyond accessing the Internet through a limited universe of devices to the Internet of things-the potential intrusion on privacy only increases.
 

 Under the government's playbook-which the district court effectively endorsed-plaintiffs would be deprived all opportunity to challenge the legality of most, if not all, these electronic surveillance efforts, notwithstanding the significant intrusion on individual rights posed by such surveillance. To be sure, it can be difficult to apply analog law in the digital age, and courts must tread carefully in so doing. But courts must not avoid the difficult legal issues raised by new technology by erecting procedural barriers that ensure they never will be addressed. The district court's disposition of Attkisson's claims against the Doe Defendants, which the majority opinion affirms, does precisely that.
 

 Accordingly, I respectfully dissent.
 

 I concur in the majority opinion's judgment that the district court properly dismissed Attkisson's claims against the former Attorney General and former Postmaster General. I believe that Attkisson failed to plausibly allege that the former Attorney General and former Postmaster General were involved in any potential violation of Attkisson's constitutional or statutory rights.
 

 Brendan Marks,
 
 With Four Corners Offense, Dean Smith Changed Basketball
 
 , Daily Tar Heel (Feb. 9, 2015), https://www.dailytarheel.com/article/2015/02/with-fourcorners-offense-dean-smith-changed-basketball.
 

 Attkisson's husband, James, and daughter, Judith, are also named plaintiffs because the alleged intrusions and commandeering of the Attkissons' home computers and devices allegedly violated their statutory and constitutional rights as well.
 

 Because the parties had to wait several months for the appointment of a judge, Attkisson bears no responsibility for the inaction in the case between March and July 2017 highlighted in the majority opinion.
 
 Ante
 
 at 614-15.
 

 The majority opinion states that the factors identified in
 
 Hillig
 
 should "guide" the district court's analysis in determining whether to dismiss a case under Rule 41(b), and therefore that the district court did not reversibly err in failing to consider those factors.
 
 Ante
 
 at 624-25. The majority opinion nowhere reconciles its reasoning with
 
 Hillig
 
 's controlling holding that district courts are "required" to consider those four factors.
 
 916 F.2d at 174
 
 . The majority opinion also nowhere reconciles its conclusion with the unanimous conclusion of the Courts of Appeal that dismissals under Rule 41(b) should be limited to "extreme circumstances."
 

 I agree with the majority opinion that the district court did not abuse its discretion in denying Attkisson leave to amend her complaint to rename the United States as a defendant, add several Verizon-affiliated entities as defendants, and resurrect several previously dismissed claims.
 
 Ante
 
 at 624-26. The court's order did not authorize Attkisson to make such amendments, and Attkisson never sought the court's leave to do so. But the majority opinion improperly conflates the district court's (correct) disposition of Attkisson's proposed amended complaint with the district court's (incorrect) dismissal of Attkisson's claims against the Doe Defendants, who had been listed as defendants since the case's inception. Whether Attkisson's proposed amended complaint was proper had no bearing on whether Attkisson's long-standing claims against the Doe Defendants, as set forth in her operative complaint, warranted dismissal.
 

 The majority opinion further concludes that the district court "implicitly relied" on Federal Rule of Civil Procedure 4(m) in dismissing Attkisson's claims against the Doe Defendants because Attkisson failed to establish "good cause" for her failure to timely serve the Doe Defendants.
 
 Ante
 
 at 627 n.13. But the district court's terse footnote dismissing the Doe Defendants nowhere mentions Rule 4(m). And Attkisson did have "good cause" for failing to serve the Doe Defendants-she never obtained the discovery from the government necessary for her to identify the Defendants.